547 A.2d 447

Lucky Strike Coal Company and Louis J. Beltrami, Petitioners *v.* Commonwealth of Pennsylvania, Department of Environmental Resources, Respondent.

Argued April 18, 1988, before Judges CRAIG and COLINS, and Senior Judge KALISH, sitting as a panel of three.

*Edward E. Kopko,* for petitioners.

*Timothy J. Bergere,* Assistant Counsel, for respondent.

OPINION BY SENIOR JUDGE KALISH, June 30, 1988:

Appellants, Lucky Strike Coal Company (Lucky Strike) and its President, Louis J. Beltrami (Beltrami) appeal from an order of the Environmental Hearing Board (Board) assessing civil penalties against both of them for violations of the Clean Streams Law, Act of June 22, 1937, P.L. 1987, *as amended,* 35 P.S. §691.1. We affirm.

On August 6, 1975, Lucky Strike obtained from the Department of Environmental Resources (DER) an Industrial Waste Permit (Permit) for the operation of the Huber Colliery in Luzerne County. The Permit forbids the discharging of any of Lucky Strike's industrial wastewater into the surface waters of the Commonwealth.

The Huber Colliery complex is comprised of a large coal processing plant and a coal sizing plant. The sizing plant operation involves the separation and segregation of anthracite coal according to the size of the coal. During the coal sizing operation, large quantities of water flow over the sized coal. In order to comply with the Permit, Lucky Strike proposed, and the DER approved, an on-site wastewater treatment facility for the Huber Colliery. Under the approved treatment system, the wastewater from the sizing process is directed from the sizing plant to the Preston Dam. The wastewater is then pumped from the dam to settling lagoons for natural discharge by percolation into the groundwater.

The Board found that Lucky Strike was not pumping the wastewater from the Preston Dam to the settling lagoons. Instead, Lucky Strike allowed the dam to fill to capacity, resulting in an overflow into surface waters of the Commonwealth, specifically into a stream called Sugar Notch Run.

The Board found Lucky Strike liable for illegal discharges of wastewater into Sugar Notch Run on November 20 and 21, 1979. The Board also found Lucky Strike liable for violations of Section 307 of the Clean Streams Law on all dates that it operated its sizing plant from December 10, 1979 through January 8, 1980. The Board imposed liability for discharges on these dates because on December 10, 1979, DER officials discovered that the pump at the Huber Colliery sizing plant was not in operation. Without a properly operating pump, water cannot be directed from the Preston Dam to the settling lagoons. When the sizing plant operates without a functioning pump, the dam eventually overflows and an illegal discharge goes into Sugar Notch Run. The Board assessed a penalty of $2,000 per day for each of Lucky Strike's twenty-three violations, for a total of $46,000.

The Board also found Beltrami personally liable for all of the twenty-three violations. Beltrami had worked in the coal industry for thirty years and he was familiar with all aspects of coal sizing. The Board found that Beltrami knew that the sizing plant was discharging wastewater into Sugar Notch Run and he had actually been provided a sample of the discharge, and told that it was illegal. However, he continued to operate the sizing plant, regardless of the resulting pollution.

Our scope of review is limited to a determination of whether constitutional rights were violated, an error of law was committed, or whether necessary findings of fact are supported by substantial evidence. Section 704 of the Administrative Agency Law, 2 Pa. C. S. §704; *Estate of McGovern v. State Employees' Retirement Board*, 512 Pa. 377, 517 A.2d 523 (1986).

Lucky Strike and Beltrami contend that they were not afforded due process since the Board's decision was based on a "cold record," and that the Board's decision

was not based on substantial evidence. Furthermore, they argue that the failure by the Board to include in the record any findings from the on-site inspection is violative of their constitutional rights of due process.

The record is clear that there is substantial evidence to support the Board's finding that the petitioners permitted the flow of the wastewater into Sugar Notch Run and that Beltrami made a conscious decision to continue these operations. The petitioners did not offer any defense to this nor did they file a post-hearing brief.

Since the present Board members were not·the members of the Board at the time of the hearing, their adjudication was based on a "cold record." However, in the context of an administrative hearing before the Board, all that is required to meet due process is that the Board review and consider the record before an adjudication is issued. *Caldwell v. Clearfield County Children and Youth Services,* 83 Pa. Commonwealth Ct. 49, 476 A.2d 996 (1984). In *Foley Brothers, Inc. v. Commonwealth,* 400 Pa. 584, 592, 163 A.2d 80, 85 (1960) the Supreme Court said that, "the signatures of all three arbitrators is a guarantee, absent evidence to the contrary, that they gave full consideration to the case, . . ."

In the instant case, there being·no evidence to the contrary, it must be presumed that the Board members did consider the evidence presented, whether or not all were present, at all of the sessions. *Acitelli v. Westmont Hilltop School District,* 15 Pa. Commonwealth Ct. 214, 325 A.2d 490 (1974). Here, the Board examined the record and made extensive findings of fact based upon the record. Next to each finding of fact in the Board's opinion, a specific reference was made as to where the finding appeared in the record. "In order to properly review findings of fact, the record from which they are derived must be examined in order to determine if the findings are based on substantial evidence." *Depart-*

*ment of Transportation v. Pennsylvania Human Relations Commission,* 510 Pa. 401, 407, 508 A.2d 1187, 1190 (1986). The record shows that the petitioners did not raise any facts which might affect the Board's decision in relying on the record.

The petitioners could have raised issues regarding the findings of fact and conclusions of law in a post-hearing brief, thereby preserving these issues for appeal. In 25 Pa. Code §21.116(b), the Environmental Hearing Board procedure allows for a post-hearing brief which shall include suggested findings of fact and conclusions of law. Here, the petitioners did not file a post-hearing brief.

Regarding petitioners request for an on-site inspection, an on-site inspection is not required by statute nor by procedural due process requirements. The petitioners contend that an on-site inspection was necessary to determine whether there was a stream running through the property. However, since it was accepted that there was a stream running through the property, an on-site inspection was neither relevant nor probative. Thus, the Board did not abuse its discretion in denying such a request.

Accordingly, we affirm.

### ORDER

Now, June 30, 1988, the order of the Environmental Hearing Board No. EHB 80-211-CP-W, dated April 22, 1987, is affirmed.